## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                       No. CR 12-0411 JB

JOSHUA FERDMAN,
AMIR MEIR LEVI,
JEFFREY P. CONTELLA, and
JOSEPH COHEN,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant's Objections to the Presentence Report and Restitution and Sentencing Memorandum, filed August 2, 2013 (Doc. 197)("Objections"); and (ii) the Defendant's Amended Objections to the Presentence Report, filed August 16, 2013 (Doc. 204)("Amended Objections"). The Court held a sentencing hearing on August 16, 2013. The primary issues are: (i) whether, under U.S.S.G. § 2B1.1, Sprint's retail value of the cellular telephones that Defendant Joshua Ferdman fraudulently obtained is the correct value to use in calculating Sprint's loss; (ii) whether, under U.S.S.G. § 2B1.1, the cellular telephones fraudulently obtained between May 8 and May 14, 2011, are properly included in the calculation of loss; (iii) whether Sprint's shipping costs are properly included in the calculation of loss; (iv) whether, under the Mandatory Restitution to Victims Act, 18 U.S.C. § 3663A ("MVRA"), the listed retail value of the cellular telephones fraudulently obtained is the correct value to use in determining the amount of restitution awarded to Sprint; and (v) whether Sprint's shipping and investigative costs are properly included in the restitution amount. The Court will overrule in part and sustain in part Ferdman's sentencing guidelines

objections, resulting in a six-level enhancement for causing more than $30,000.00 and less than $70,000.00 in loss, based on the retail value of the cellular telephones fraudulently obtained between May 15 and May 25, 2011, and Sprint's shipping costs.   The Court will overrule Ferdman's objections to the restitution calculation, and orders $48,715.59 in restitution to Sprint, based on the retail value of the cellular telephones fraudulently obtained between May 15 and May 25, 2011, plus Sprint's shipping and investigative costs.

### FACTUAL BACKGROUND

Defendant Ferdman, along with co-defendants Amir Meir Levi, Jeffrey P. Contella, and Joseph Cohen, participated in a scheme to fraudulently obtain and resell electronic devices, mainly cellular telephones, from Sprint stores in multiple states.  See Presentence Investigation Report ¶ 57, at 14, disclosed April 22, 2013 ("PSR").  Ferdman and Levi unlawfully accessed account information for Sprint customers, including account numbers, names, and other personal identification.  See PSR ¶ 6, at 4.  They traveled to Sprint stores in California, Arizona, and New Mexico, and impersonated an authorized representative of the account holder.  See PSR ¶ 6 at 4. Ferdman and Levi obtained cellular telephones from Sprint free of charge by impersonating the account holders and billing the telephones to corporate accounts.  See PSR ¶ 7, at 5.  Receipts from these transactions show the retail price of the cellular telephones ranging from $449.99 for a Blackberry 9650 or HTC Evo, to $549.99 for a Samsung D720.  See Receipts from May 15 to May 25, 2011, at 2-3, 21, filed August 16, 2013 (Doc. 204-1)("Receipts").  The Receipts also show a "flat rate activation discount," often in the amount of $350.00, along with details of the

service plan purchased for each telephone.  Receipts at 16.  The price "paid"[1] for the telephones ranges from $149.99 for the Samsung D700 up to $199.99 for the Samsung D720, Blackberry 9650, and HTC Evo.  See Receipts at 2-3, 21.  Ferdman and Levi negotiated prices for the sale and resale of the telephones through established business outlets, including ICT Global, which was a business that Cohen owned and operated.  See PSR ¶ 7, at 5.  ICT Global maintained a physical storefront in Van Nuys, California, but also sold various electronic devices through ICELLTECH, an online store that eBay Inc. hosted.  See PSR ¶ 7, at 5.

On May 25, 2011, Ferdman entered a Sprint store in Albuquerque, New Mexico, and represented himself as an authorized account holder of a Sprint business account issued to Double Vision Glass and Mirror.  See PSR ¶ 8, at 5.  Ferdman charged thirteen smartphones to Double Vision Glass and Mirror's account.  See PSR ¶ 8, at 5.  Ferdman left the store, but contacted a Sprint employee in Albuquerque to request seven additional smartphones on the same account.  See PSR ¶¶ 8-9, at 5.  The Sprint employee became suspicious and contacted the account holder for Double Vision Glass and Mirror, and confirmed his suspicions that Ferdman was not the authorized account holder.  See PRS ¶ 9, at 5.  The Sprint employee lured Ferdman back into the store by sending a text message which stated that the order was completed and ready for pick up.  See PSR ¶ 10, at 5.  The Albuquerque Police Department then arrested Ferdman at the Sprint store for fraud.  See PSR ¶ 10, at 5.

## PROCEDURAL BACKGROUND

Ferdman was originally charged with Fraud (More than $2,500, but Less than $20,000) and Attempt to Commit a Third Degree Felony in the Bernalillo County Metropolitan Court in

---

[1] Ferdman did not pay for the cellular telephones, but the price "paid" reflects the amount Sprint billed to the corporate accounts.

Albuquerque.  See PSR ¶ 11, at 5.  He posted bond and was released from custody.  See PSR ¶ 11, at 5.  The charges were later bound over to the Bernalillo County Second Judicial District Court in Albuquerque and remain pending.  See PSR ¶ 11, at 5.  After further investigation revealed the larger scheme in which Ferdman participated, federal arrest warrants were issued for Ferdman, Cohen, Levi, and Contella on February 28, 2012.  See PSR ¶ 29, at 9.  Department of Homeland Security agents arrested Ferdman on March 6, 2012.  See PSR ¶ 43, at 12.  He was charged with Access Device Fraud and Aiding and Abetting.  See PSR ¶ 1, at 4.  Count 1 of the Indictment charged Conspiracy, in violation of 18 U.S.C. § 371; Count 2 charged Access Device Fraud and Aiding and Abetting, in violation of 18 U.S.C. § 1029(a)(2) and 18 U.S.C. § 2.  See PSR ¶ 2, at 4.  On February 14, 2013, Ferdman pled guilty to the two-count indictment.  See PSR ¶ 2, at 4.

In the PSR, the United States Probation Office ("USPO") listed the cellular telephones and accessories that the Defendants fraudulently obtained from Sprint, including the telephone types, quantity, and retail prices.  See PSR ¶ 28, at 8-9.  According to the PSR, between May 8, 2011, and May 25, 2011, the Defendants obtained 132 pieces of merchandise, with a retail value of $63,035.16.  See PSR § 28, at 9 (calculating the retail price of each smartphone between $449.99 and $549.00).

Sprint requests restitution for the losses between May 15, 2011, and May 25, 2011.  See PSR ¶ 62, at 15.  According to the USPO's calculation, the Defendants obtained $45,035.59 worth of merchandise during that time period.  See PSR ¶ 62, at 15.  The PSR also recommends an additional $3,680.00 in restitution, including $300.00 in shipping costs to replace the telephones to the Sprint stores, $2,600.00 for Sprint's investigative costs, $750.00 for

-4-

investigative travel to New Mexico, and $30.00 for setting up GPS tracking for law enforcement. See PSR ¶ 65, at 16; Letter from Court S. McGough, Sprint Regional Security Manager, to Amber Kaufman, United States Probation Officer (March 21, 2013)("Sprint Letter").  The PSR recommends that the Court hold all four co-Defendants jointly and severally accountable for $48,715.59 in restitution to Sprint.  See PSR ¶ 65, at 16.  Based on the amount of loss to Sprint from May 8, 2011, to May 25, 2011, the PSR recommends a six level increase under U.S.S.G. § 2B1.1(b)(1)(D).  See PSR ¶ 70, at 16-17.

Ferdman filed the Objections to the PSR on August 2, 2013, and the Amended Objections on August 16, 2013.  Ferdman objects to the calculation of loss under the sentencing guidelines and for restitution.  See Objections ¶ 19, at 7.  He argues that the listed price for the smartphones does not accurately measure damages, because "companies intentionally mark up the price of the smartphones which are rarely purchased at retail price to give the customers a greater illusion of a discount or savings when they purchased other products like the service contract."  Objections ¶ 25, at 8.  According to Ferdman, "[o]ften the sticker price is inflated to allow for negotiations concerning trade-ins or reduced interest rate packaging."  Objections ¶ 26, at 9.  He argues that the actual price paid, which is the amount Sprint billed to the account holders as shown on the receipts, is a better estimate of Sprint's losses.  See Objections ¶ 31, at 10.  According to his calculations, the total loss of merchandise between May 15, 2011, and May 25, 2011, is $17,034.67.[2]  See Defendant's Amended Objection, Attachment A (listing the price paid for each phone between $149.99 and $199.99).  Ferdman also objects to Sprint's claim for shipping and

---

[2] Ferdman miscalculates the subtotal for eight Samsung D720 cellular telephones, purchased for $199.99 each.  He lists the subtotal as $1,599.00, but the correct calculation is $1,599.92.  This correction brings the total to $17,035.59.

investigative costs as part of restitution.  <u>See</u> Objections ¶ 33, at 10-11.  Because the retail costs "would already have shipping costs built into the pricing, as well as loss prevention and investigation expenses," Sprint's restitution claim is "attempting unjust enrichment and double dipping."  Objections ¶ 33, at 10-11.  Ferdman agrees to pay the additional shipping and investigative costs if the price paid for the telephones is used for the restitution calculation, totaling $20,715.59.[3]  <u>See</u> Amended Objections ¶ 3, at 2.  Ferdman calculates $25,535.16 as the loss under § 2B1.1, which includes telephones from May 8, 2011, to May 14, 2011.  <u>See</u> Amended Objections ¶ 2, at 1.  Ferdman's calculation increases the offense level by four rather than six.  <u>See</u> U.S.S.G. § 4B1.1(b)(1)(C).

Plaintiff United States of America urges the Court to apply the calculation of loss from the PSR in calculating the sentencing guidelines, stating that the retail price of merchandise fraudulently obtained is the appropriate measure of the pecuniary impact on the victim.  <u>See</u> United States' Response to Defendant's Objections to the Presentence Report and Sentencing Memorandum, at 4, filed August 7, 2013 (Doc. 198)("Response").  The United States cites <u>United States v. Lige</u>, 635 F.3d 668, 671 (5th Cir. 2011), which contained facts nearly identical to the current case.  The United States Courts of Appeals for the Fifth Circuit held that the retail price of cellular telephones, which the defendant fraudulently obtained from Sprint and Nextel, was the appropriate measure of intended loss under U.S.S.G. § 2B1.1.  <u>See</u> 635 F.3d at 671.  The United States also relies on <u>United States v. Williams</u>, 50 F.3d 863 (10th Cir. 1995).  <u>See</u> Response at 4.  In that case, the Tenth Circuit held that the retail price of jewelry was the

---

[3] This amount reflects the correction made to Ferdman's calculation, discussed in footnote 2, <u>supra</u> at 5.  The amount he stated in his written objection was $20,714.67.  <u>See</u> Defendant's Amended Objections ¶ 3, at 2.

appropriate value for the calculation of loss, because the defendant stole the property from a retail establishment.  See 50 F.3d at 864.  The United States argues that Ferdman's calculations do not appropriately measure Sprint's losses, because Sprint discounted the telephones only with the purchase of accompanying service contracts.  See Response at 5.  Ferdman's calculations, the United States argues, ignore the revenue Sprint would have received from the service contracts. See Response at 5.

The United States also urges the Court to adopt the PSR's restitution calculations based on the cellular telephones' retail price.  See Response at 6.  Noting that the full retail price of the cellular telephones includes lost profits, the United States argues that other United States Courts of Appeals have affirmed the inclusion of lost profits in restitution awards.  See Response at 6-7 (citing United States v. Lively, 20 F.3d 193, 202 (6th Cir. 1994)("[I]n order to restore the mail order companies to their prior state of well being the order of restitution had to include their lost profits."); United States v. Milstein, 481 F.3d 132, 136-37 (2d Cir. 2007)(holding that restitution award may be based on lost profits)).  Additionally, the United States argues that the full retail price is the appropriate measure, because the Defendants resold the fraudulently obtained phones, making a "small but perceptible effect on Sprint's sales and profits."  Response at 7.

Although the cellular telephones were sold with service contracts, Ferdman argues in his written reply that the Court should assume that the actual purchase price fully compensates Sprint, because "companies, especially in oligopoly markets, cannot use cut price bundling." Reply to United States Response to Joshua Ferdman's Objections to the Presentence Report and Sentencing Memorandum ¶ 15, at 7, filed August 15, 2013 (Doc. 203)("Reply").  He also tries to distinguish United States v. Lige, noting that the parties in that case agreed about the retail price,

but disagreed whether to apply the wholesale or retail price.  See Reply ¶ 16, at 7.  Ferdman clarifies that he does not agree with characterizing the "list" price as the "retail" price of the cellular telephones.  Reply ¶ 11, at 5-6.  He argues that the "list" price, which the PSR calls the "retail" price, is "much like the sticker price for an automobile" and that the price paid more accurately reflects the retail price.  Reply ¶ 11, at 5-6.  Regarding the calculation under § 2B1.1, he argues that, because neither Sprint nor the United States provided receipts for the lost telephones between May 8, 2011, to May 14, 2011, the United States has not carried its burden to preserve a sound record for the Court to make a reasonable determination of the economic loss for that period.  See Reply ¶ 12, at 6.

The Court held a sentencing hearing on August 16, 2013.  Ferdman argued that the United States did not provide enough evidence to show Sprint's damages, because Sprint's damages are neither the lost profits nor the list prices of the telephones.  See Transcript of Hearing at 47:5-11 (taken August 16, 2013)(Butcher)("Tr.").[4]  He contended that the United States failed to carry its burden to prove Sprint's actual losses by a preponderance of the evidence and that Ferdman is not responsible for the lack of information.  See Tr. 46:14-19; 49:9-13 (Butcher).  He argued that the United States speculated that the actual price paid for the telephones would not fully compensate Sprint.  See Tr. 50:24-25 (Butcher).  He also argued that predatory pricing is illegal, so the Court should not assume that Sprint priced its telephones below market when it paired the phones with service plans.  See Tr. 51:5-8 (Butcher).

The United States urged the Court to follow the Fifth Circuit's decision in United States

---

[4] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

v. Lige, which the United States argued used the "full retail value" of the cellular telephones rather than mentioning an actual price paid.  Tr. 56:2-17 (Anderson).  The United States argued that there is evidence of Sprint's business model in the receipts, because the receipts list the full price and a "flat rate activation" discount for purchasing the telephones with service plans.  Tr. 57:9-25 (Anderson).

The parties disagreed about what the Fifth Circuit used as the "retail value" in United States v. Lige.  Ferdman argued that the Fifth Circuit used the price paid as the telephones' retail price.  See Tr. 61:1-11 (Butcher).  The United States argued, however, that the Fifth Circuit said "full retail price" in its opinion and never mentioned the price paid for the telephones.  Tr. 65:5-9 (Anderson).

## RELEVANT LAW REGARDING CALCULATION OF LOSS UNDER THE SENTENCING GUIDELINES

Section 2B1.1 of the United States Sentencing Guidelines controls a court's determination when sentencing a defendant for "Larceny, Embezzlement, and other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States."  U.S.S.G. § 2B1.1.  The Guidelines call for offense-level enhancements in varying amounts if the loss to the victim is more than $5,000.00.  See U.S.S.G. § 2B1.1(b)(1)("If the loss exceeded $5,000, increase the offense level as follows . . . .")).  "The court need only make a reasonable estimate of the loss."  U.S.S.G. § 2B1.1, cmt. n.3(C).  The Guidelines neither proscribe, nor prohibit, a methodology for a court to use when calculating the "reasonable estimate" of the loss a defendant's conduct caused.  United States v. Garcia, No. CR 10-1727 JB, 2013 WL 1635477, at *39 (D.N.M. March 22, 2013)(Browning, J.)(citing United

States v. Erpenbeck, 532 F.3d 423, 433 (6th Cir. 2008)(rejecting a defendant's argument that the entire value of collateral that he pledged for a legitimate loan should be used to off-set his fraudulent transactions, and holding that the collateral should be reduced prorata based upon the ratio of the fraudulent transactions to the underlying, legitimate loan).

"Loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," while intended loss means "the pecuniary harm that was intended to result from the offense . . . ." U.S.S.G. § 2B1.1 cmt. n.3(A). Pecuniary harm is defined as "harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm." U.S.S.G. § 2B1.1 cmt. n.3(A)(iii). Reasonably foreseeable pecuniary harm is "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(iv).

When a loss amount is disputed, the United States bears the burden of establishing its estimation of loss by a preponderance of the evidence. See United States v. Garcia, No. CR 10-1727 JB, 2013 WL 1635477, at *40 (D.N.M. March 22, 2013)(Browning, J.)(citing Guidelines Handbook § 14, at 353). The Tenth Circuit has, accordingly, ruled that a district court cannot include losses in its calculation under § 2B1.1 until the "Government first . . . prove[s] by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state statute." United States v. Kieffer, 681 F.3d 1143, 1168 (10th Cir. 2012). Next, the United States must "prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by

a preponderance of the evidence."  681 F.3d at 1168 (citing United States v. Peterson, 312 F.3d

1300, 1302 (10th Cir. 2002)).   Because the damage from fraud can be difficult to calculate, the

district court needs only to "make a reasonable estimate of loss rather than a precise

determination."  United States v. Gregoire, 638 F.3d 962, 970 (8th Cir. 2011).

 For example, in United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814

(D.N.M. June 22, 2012)(Browning, J.), the Court determined that an enhancement pursuant to

U.S.S.G. § 2B1.1(b)(1) was unwarranted, because, although the United States contended that a

New Mexico Corrections Department facilities manager awarded four million dollars' worth of

state government contracts to a developer in exchange for bribes, the United States submitted no

evidence regarding the profit, if any, the developer received from the contracts.  See 2012 WL

2574814, at *1, **9-10.  The Court noted that, without "evidence regarding the value of the

benefit Moya received under these government contracts, the United States cannot establish by a

preponderance of the evidence that an . . . enhancement is appropriate under this guideline."

2012 WL 2574814, at *10.

## RELEVANT LAW REGARDING RESTITUTION

 Courts do not have inherent power to order restitution, but may do so only when a statute

so authorizes.   See United States v. Harwood, 854 F. Supp. 2d 1035, 1051 (D.N.M.

2012)(Browning, J.)(citing United States v. Gordon, 480 F.3d 1205, 1210 (10th Cir. 2007)).  The

Victim and Witness Protection Act of 1982, 18 U.S.C. § 3663 ("VWPA"), and the Mandatory

Victims Restitution Act of 1996, 18 U.S.C. § 3663A, are the two general acts establishing a

court's authority to order restitution.  See 3 C. Wright, A. Leipold, P. Henning, & S. Welling,

Federal Practice & Procedure: Criminal § 546, at 241 (4th ed 2011)("3 C. Wright").  "The court,

in imposing a sentence on a defendant who has been found guilty of an offense shall order restitution in accordance with section 3663A, and may order restitution in accordance with section 3663."  18 U.S.C. § 3556.  In the Tenth Circuit, restitution is not criminal punishment, but is based "in the field of compensation and remediation."  United States v. Serawop, 505 F.3d 1112, 1123 (10th Cir. 2007)(acknowledging that other circuits treat criminal restitution as a criminal penalty).

In 1982, Congress enacted the VWPA, which authorizes district courts to, in their discretion, order restitution for victims of criminal conduct. See 18 U.S.C. § 3663(a)(1)(A) (stating that a district court "may order" that a defendant make restitution to any victim of an offense or, if the victim is deceased, to the victim's estate).  See also United States v. Quarrell, 310 F.3d 664, 677 (10th Cir. 2002)("Under the VWPA, the court has discretion to order restitution 'when sentencing a defendant convicted under this title . . . other than an offense described in section 3663A(c).'").  The VWPA applies when a court sentences

> a defendant convicted of an offense under this title, section 401, 408(a), 409, 416, 420, or 422(a) of the Controlled Substances Act (21 U.S.C. 841, 848(a), 849, 856, 861, 863) (but in no case shall a participant in an offense under such sections be considered a victim of such offense under this section), or section 5124, 46312, 46502, or 46504 of title 49, other than an offense described in section 3663A (c) . . . .

18 U.S.C. §3663(a)(1)(A).  The VWPA requires a court to consider the defendant's economic circumstances before ordering restitution.  See 18 U.S.C. § 3663(a)(1)(B).

In 1996, Congress enacted the MVRA, which made restitution mandatory in certain cases, "particularly crimes of violence and theft crimes with identifiable victims who 'suffered a physical injury or pecuniary loss.'" United States v. Serawop, 505 F.3d at 1117 (citing 18 U.S.C. § 3663A(c)(1)).  The MVRA applies:

**(c)(1)** . . . in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense --

> **(A)**   that is --
>
>> **(i)**   a crime of violence, as defined in section 16;
>>
>> **(ii)**   an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit;
>>
>> **(iii)**   an offense described in section 1365 (relating to tampering with consumer products); or
>>
>> **(iv)**   an offense under section 670 (relating to theft of medical products); and
>
> **(B)**   in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.
>
> **(2)**   In the case of a plea agreement that does not result in a conviction for an offense described in paragraph (1), this section shall apply only if the plea specifically states that an offense listed under such paragraph gave rise to the plea agreement.

18 U.S.C. § 3663A(c)(1).  "Unlike the VWPA, the MVRA does not permit a court to consider a defendant's economic circumstances when it imposes restitution."  United States v. Serawop, 505 F.3d at 1118 (citing 18 U.S.C. § 3664(f)(1)(A)).

Other than the mandatory nature of restitution under the MVRA and the requirement that a court consider a defendant's economic circumstances under the VWPA, the "'provisions of the VWPA and MVRA are nearly identical in authorizing an award of restitution.'"  United States v. Serawop, 505 F.3d at 1118 (quoting United States v. Randle, 324 F.3d 550, 555-56 & nn.2-3 (7th Cir. 2003).  For determining the amount of restitution, the MVRA and VWPA are "functionally identical."  United States v. Hosking, 567 F.3d 329, 332 n.2 (7th Cir. 2009).  To the extent that

the statutes use the same language, cases interpreting one statute are persuasive in interpreting the other.   See United States v. Wilfong, 551 F.3d 1182, 1185 n.3 (10th Cir. 2008)("Interpretations of the VWPA are relevant to the MVRA, except where the language is different."); 3 C. Wright, supra § 546, at 241 ("The two general acts that are the foundation for most of the substantive restitution law, the VWPA of 1982 and the MVRA of 1996, are similar and . . . cases decided under one act generally serve as precedents for the other.").

"The 1996 Act defines four general categories of losses that must be covered by restitution.  The language of the 1996 Act was borrowed almost entirely from the 1982 Act, and this is one area where cases under one act may be cited as authority under the other." 3 C. Wright, supra § 546, at 245.  These four categories of losses are: (i) damage to or loss or destruction of property, see 18 U.S.C. § 3663(b)(1); 18 U.S.C. § 3663A(b)(1); (ii) bodily injury including the cost of medical care, psychiatric and psychological care, physical and occupational rehabilitation, and the victim's lost income, see 18 U.S.C. § 3663(b)(2); 18 U.S.C. § 3663A(b)(2); (iii) if the bodily injury results in death, the cost of funeral and related services, see 18 U.S.C. § 3663(b)(3); 18 U.S.C. § 3663A(b)(3); and (iv) the victim's expenses incurred during participation in the investigation or prosecution of the offense, see 18 U.S.C. § 3663(b)(4); 18 U.S.C. § 3663A(b)(4).

Additionally, the VWPA and MVRA envision that, if the district court determines that difficulty in calculating restitution would complicate and prolong the sentencing process, the court may decline to order restitution.  See 18 U.S.C. § 3663(a)(1)(B)(ii) ("To the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide

restitution to any victims, the court may decline to make such an order.").

> This section shall not apply in the case of an offense . . . if the court finds, from facts on the record, that . . . determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

18 U.S.C. § 3663A(c)(3).  Under both statutes, the term "victim" means

> a person directly and proximately harmed as a result of the commission of an offense as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. In the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2).  Section 3664 governs how courts are to issue and enforce restitution awards for both the VWPA and MVRA.  See 18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d); 18 U.S.C. § 3556.

Any dispute "as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence" and the "burden of demonstrating the amount of loss sustained by a victim as a result of the offense shall be on the attorney for the Government."  18 U.S.C. § 3664(e).  See United States v. Serawop, 505 F.3d at 1117 (stating that the United States bears the burden of proving amount of loss under the MVRA); United States v. Diamond, 969 F.2d 961, 965 (10th Cir. 1992)(stating that the United States bears the burden of establishing the amount of loss by a preponderance of the evidence under the VWPA).  The burden of "demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents" is on the defendant.  18 U.S.C. § 3664(e).  "The burden of

-15-

demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires."  18 U.S.C. § 3664(e).

      1.      <u>**Damage, Loss, or Destruction of Property Under the MVRA**</u>.

The MVRA provides that a sentencing court will order restitution for each defendant who has committed an offense against property, including any offense "committed by fraud or deceit," in which "an identifiable victim or victims has suffered a physical injury or pecuniary loss."  18 U.S.C. § 3663A(c)(1).  <u>See</u> <u>United States v. Serawop</u>, 505 F.3d 1112, 1117 (10th Cir. 2007).  In cases resulting in "damage to or loss or destruction of property," a court's order of restitution shall require that the defendant

    (A)    return the property to the owner of the property or someone designated by the owner; or

    (B)    if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to --

        (i)    the greater of --

            (I)    the value of the property on the date of the damage, loss, or destruction; or

            (II)    the value of the property on the date of sentencing, less

        (ii)    the value (as of the date the property is returned) of any part of the property that is returned.

18 U.S.C. § 3663A(b)(1).  The MVRA "instructs the court on <u>what</u> to value -- the property -- and <u>when</u> to value it -- on the date of the damage, loss, or destruction; or on the date of sentencing, whichever is greater; or, in the case of the offset value, on the date the property is returned." <u>United States v. James</u>, 564 F.3d 1237, 1245 (10th Cir. 2009)(emphasis in original)(citing <u>United States v. Boccagna</u>, 450 F.3d 107, 114 (2d Cir. 2006)).  "However, the statute is silent on the

question of how the referenced property is to be valued."  United States v. James, 564 F.3d at 1245 (emphasis in original).

Courts are to "order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664(f)(1)(A).  Sentencing courts must determine "the best measure of value for the purpose of calculating the actual loss in awarding restitution," keeping in mind the purpose of restitution is not "to punish defendants or to provide a windfall for crime victims, but rather to ensure that victims, to the greatest extent possible, are made whole for their losses."  United States v. James, 564 F.3d at 1246 (quoting United States v. Parker, 553 F.3d 1309, 1323 (10th Cir. 2009)).  Courts consider "the amount of loss actually caused by the defendant's offense."  United States v. Messner, 107 F.3d 1448, 1455 (10th Cir. 1997).  The restitution order must not exceed the actual loss that the defendant's conduct caused, as that would be an illegal sentence constituting plain error.  See United States v. James, 564 F.3d at 1243.  The proper focus in ordering restitution is on the victim's losses rather than on the defendant's gain.  See United States v. Galloway, 509 F.3d at 1253 (reversing restitution award based on defendant's gain and remanding for the district court to calculate the victim's actual loss).

Although a court may look to "fair market value of the property unlawfully taken" in determining a proper sentence under the sentencing guidelines, U.S.S.G. § 2B1.1 cmt. n.3(C), that may or may not be the proper valuation of the property for restitution purposes.  While the loss amount for the sentencing guidelines is "closely related" to the victims' losses for restitution purposes, United States v. Niebuhr, 456 F. App'x 36, 38 (2d Cir. 2012)(quoting United States v. Corpus, 110 F.3d 1529, 1537 (10th Cir. 1997)), the two calculations are not identical, because

they derive their calculations from separate sources.  <u>See</u> 456 F. App'x at 38.  The MVRA focuses on the "full amount of each victim's losses as determined by the court."  <u>United States v. Kieffer</u>, 681 F.3d 1143, 1171 (10th Cir. 2012)(quoting 18 U.S.C. § 3664(f)(1)).  The goal is to "make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being."  456 F. App'x at 38 (quoting <u>United States v. Pescatore</u>, 637 F.3d 128, 139 (2d Cir. 2011)).  On the other hand, the sentencing guidelines link the offense level for fraud offenses to "the harm caused to victims, measured in terms of monetary loss."  456 F. App'x at 39 (quoting <u>United States v. Byors</u>, 586 F.3d 22, 225 (2d Cir. 2009)).  <u>See</u> <u>United States v. James</u>, 564 F.3d 1237, 1247 (10th Cir. 2009)(citing <u>United States v. Stoupis</u>, 530 F.3d 82, 84-85 & n. 4 (1st Cir. 2008)(recognizing that "'value' for MVRA purposes is distinct from 'loss' for Sentencing Guidelines purposes" and commenting on U.S.S.G. § 2B1.1 cmt. n.3(C)(i)).  The United States Court of Appeals for the Second Circuit summarized the relation between the two provisions:

> [T]he MVRA is intended to compensate victims, while sentencing enhancements for loss amount under the Guidelines are predicated on the notion that fraudsters who cause more monetary harm are more culpable and should therefore be given longer terms of imprisonment.  As we have held, because a defendant's culpability will not always equal the victim's injury, an amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution.

<u>United States v. Niebuhr</u>, 456 F. App'x at 39 (citations and internal quotation marks omitted).

### 2.    <u>Investigative Costs Under the MVRA.</u>

The MVRA requires a court's restitution order to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."

18 U.S.C. § 3663A(b)(4).   In <u>United States v. French</u>, 357 F. App'x 177, (10th Cir. 2009)(unpublished decision),[5] the Tenth Circuit affirmed a district court's restitution order reimbursing a victim for attending court proceedings.   <u>See</u> 357 F. App'x at 178-79.   The defendant challenged the restitution order, arguing that "such costs were discretionary, incurred solely because of [the victim bank's] internal policies, and not requested by the other victim banks."   357 F. App'x at 178.   He argued that "the attendance-related expenses were not a direct and proximate result of the robbery, but rather consequential expenses that are impermissible bases for restitution."   357 F. App'x at 178.   The Tenth Circuit rejected this argument, saying that it "confuses the question of [the victim bank's] status as a victim under the Act with the question of which losses that flow from that status are covered by the Act."   357 F. App'x at 179. Once a court identifies a victim, defined as "a person directly and proximately harmed as a result of the commission of an offense," 18 U.S.C. § 3663A(a)(2), the MVRA "merely requires the included expenses be necessary, and that they be incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." <u>United States v. French</u>, 357 F. App'x at 179 (internal citations and quotation marks omitted).

---

[5] <u>United States v. French</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."   <u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that <u>United States v. French</u> has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

## ANALYSIS

Ferdman objects to the PSR's calculation of loss under the sentencing guidelines and for restitution purposes.  For both calculations, he objects to the use of the retail value, which he calls the "list" price, as the measure of Sprint's loss and argues instead that the Court should use the actual price paid for the cellular telephones.  For the calculation of loss under the Guidelines, he argues against the inclusion of the cellular telephones fraudulently obtained from May 8 to May 14, 2011, because the United States has not produced receipts from those transactions.  He also argues against the inclusion of the shipping costs for the same lack of documentation, and because he alleges that the retail price of the cellular telephones includes the shipping costs.  For the restitution calculation, he argues against the inclusion of the shipping costs and investigative costs, because he alleges those costs are included in the retail price of the telephones.

The Court will overrule Ferdman's objections to the sentencing guidelines in part and sustain them in part.  The full retail price is the correct measure of damages, because it reflects Sprint's losses from Ferdman's actions.  The actual price paid does not take into account the service contracts accompanying the cellular telephone purchases.  The shipping costs will also be included in the total for purposes of the sentencing guidelines, based on the letter from Sprint. See Sprint Letter at 1.  The Court will sustain Ferdman's objection regarding the inclusion of the telephones from May 8 to May 14, 2011, because the United States did not carry its burden to prove Sprint's losses for that period.  Ferdman's conduct caused a loss between $30,000.00 and $70,000.00, resulting in a 6-level sentence enhancement.

The Court will overrule Ferdman's objections to the restitution calculation.  The retail value of merchandise fraudulently obtained is a proper consideration under the MVRA for

property loss, and the United States has established the full retail price as the cellular telephones' value by a preponderance of the evidence.  The United States has also established by a preponderance of the evidence that the restitution award should include the shipping and investigative costs.

I.    **THE COURT WILL OVERRULE IN PART AND SUSTAIN IN PART FERDMAN'S OBJECTIONS TO THE CALCULATION OF LOSS UNDER THE GUIDELINES.**

In cases of fraud, the guidelines provide for a 4-level enhancement when the loss is between $10,000.00 and $30,000.00.  See U.S.S.G. § 2B1.1(b)(1)(C).  When the loss is more than $30,000.00 and up to $70,000.00, there is a 6-level enhancement.  See U.S.S.G. § 2B1.1(b)(1)(D).  A court needs only to "make a reasonable estimate of the loss" and can take into account "the fair market value of the property unlawfully taken."  U.S.S.G. § 2B1.1 cmt. n.3(C).  The Tenth Circuit has held that loss can be calculated with the retail price of items stolen from retail establishments.  See United States v. Williams, 50 F.3d 863, 864 (10th Cir. 1995)(Kelly, J.)("[T]he trial court correctly determined the value to be the retail price of the jewelry.  The jewelry was stolen from a retail establishment, not from a wholesaler.").

Directly on point, the Fifth Circuit has held that the retail price of fraudulently obtained cellular telephones is the proper measure of damages under U.S.S.G. § 2B1.1.  See United States v. Lige, 635 F.3d 668, 669 (5th Cir. 2011)(Elrod, J.).  In that case, the defendant impersonated legitimate account holders and ordered cellular telephones, charging the telephones to the accounts but having the telephones shipped to his address.  See 638 F.3d at 670.  The defendant then resold the telephones to other individuals.  See 635 F.3d at 670.  Sprint and Nextel delivered eighty-five orders, but canceled 112 orders because of suspected fraud.  See 635 F.3d at 670.

The PSR determined that the delivered orders resulted in an actual loss of $112,655.00, and the intended loss, including undelivered orders, was $245,881.00.  See 635 F.3d at 670.  Lige argued that the intended loss calculation should be based on the wholesale market price rather than on the retail price of the cellular telephones, but the district court disagreed and instead used the retail value.  See 635 F.3d at 670.  The Fifth Circuit reviewed the method of estimating loss de novo and determined that the retail value was the correct method of estimating loss.  See 635 F.3d at 671.  Pursuant to the Guidelines, the Fifth Circuit noted that one factor to consider is "the fair market value of the property unlawfully taken, copied, or destroyed."  635 F.3d at 671 (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)(i)).  Lige argued that the retail value of the telephones "would essentially include lost profits."  635 F.3d at 671.  The Fifth Circuit stated:

> Lige's argument ignores the fact that Sprint and Nextel are not in the business of selling phones at cost.  They incur overhead costs and operating expenses beyond the wholesale cost of their merchandise, and are in business to make profits -- profits that they did not receive on Lige's fraudulent orders.

United States v. Lige, 635 F.3d at 671.

Following the guidance of the Fifth and Tenth Circuits, the Court holds that the correct measure of damages in this case is the retail value of the cellular telephones that Ferdman fraudulently obtained from Sprint.  Sprint sells cellular telephones to consumers for a profit, not at cost -- it builds overhead costs, operating expenses, and profits into the retail price of its merchandise.  When Ferdman fraudulently obtained the cellular telephones without paying for them, Sprint did not lose only the merchandise, but also the profits it anticipated.  The Court concludes that using the retail value of the cellular telephones is a "reasonable estimate of loss," United States v. Gregoire, 638 F.3d at 970, and also appropriately focuses the calculation on the "pecuniary impact" on Sprint, United States v. Lige, 635 F.3d at 671.

-22-

The parties disagree, however, regarding what is the "full retail value" of the cellular telephones. The USPO and the United States refer to the higher prices of $449.99, $499.99, and $549.99 as retail prices, which are also the prices Sprint calls its "retail unsubsidized price[s]" or "retail price[s]" in its letter to the USPO. PSR ¶ 28, at 9; Sprint Letter at 1. Ferdman, on the other hand, is less consistent in what he calls the retail price. In his initial written objections, he notes that "very few smartphones are purchase[d] at the retail price," referring to what the PSR calls retail prices. Objections ¶ 25, at 8. In his calculation chart, he again refers to the highest amounts as the retail price of the telephones, and refers to the lower prices of $149.99 and $199.99 as the "actual price paid." See Defendant's Objections, Attachment A (using the terms "retail price" to refer to the higher prices of the cellular telephones on his calculations chart). He says that the "listed retail price" is not the actual price of the product, Objections ¶ 26, at 8, and that the wholesale or replacement costs of the telephones would be an accurate calculation except that Sprint "has chosen not to provide that information." Objections ¶¶ 34-35, at 11-12. After the United States argued against using the telephones' wholesale price, see Response at 4, Ferdman began referring to the higher price as the "list" price and to the price paid as the "retail" price, Reply ¶ 11, at 5-6, Defendant's Amended Objection, Attachment A (using the terms "list" to refer to the higher prices of the cellular telephones on his calculations chart). "The government and Addendum seem[] confused from an economic definition sense between the terms 'retail' and 'list.'" Reply ¶ 11 at 6. He says that he "never asked the Court to use the wholesale price to determine loss or restitution," Reply ¶ 11, at 6, but, on the same page, argues that "Sprint is both a wholesaler and retailer," and that United States v. Williams, in which the

Tenth Circuit used the retail value rather than the wholesale value of jewelry for the loss calculation under the sentencing guidelines, is inapplicable, Reply ¶ 14, at 6.

Ferdman's argument suggests that how Sprint and other telecommunications companies price their products is some mystery, but there is really little doubt how they do it.  Companies often subsidize the price of cellular telephones and then recover costs through service fees by locking the customers into service plan contracts.  See Erik Berte, Are Carrier Subsidies Hurting Innovation and Driving Up Mobile Phone Costs?, FOXBusiness (May 22, 2012), http://www.foxbusiness.com/technology/2012/05/22/are-carrier-subsidies-hurting-innovation-and-driving-up-mobile-phone-costs ("Carrier Subsidies").   The Honorable Denise L. Cote, United States District Judge for the United States District Court for the Southern District of New York, has also recognized the business model of most telecommunications companies:

> It is undisputed that since the inception of wireless service in the U.S., wireless service providers have sold their respective service and handsets as a package, and that in doing so, the carriers have subsidized the cost of handsets to make initial entry into the wireless services market "more palatable." Although wireless handsets have become much more affordable over the last fifteen years, wireless service providers continue to package service and handsets, subsidizing the latter, "to continue to open up markets and make it affordable" for consumers to obtain wireless service.

In re Wireless Telephone Servs. Antitrust Litig., 385 F. Supp. 2d 403, 410 (S.D.N.Y. 2005).

In Europe, people largely buy cellular telephones separately from their telephone service. See Carrier Subsidies ("[I]n Europe, mobile phone plans with contracts are much less common than in the U.S.  According to a report from Deloitte, in 2009 87% of customers were prepaid in Italy, 68% in the U.K., 55% in Germany, and 42% in Spain.  That compares to just 22% in the U.S.").  As a result, Europeans pay higher prices for the telephones and lower prices for the services.  See Carrier Subsidies ("[T]he average monthly revenue from U.S. customers for

carriers is $50.67. . . .  Europe's overall average is $30.83 . . . ."). Americans, on the other hand, often buy their telephone and service together.

> Dumping subsidies and paying a lot more up-front for a phone might sound radical, but outside the U.S. it's pretty common. "The North American markets (U.S. and Canada) are really the only two in the world that have this complete addiction to the phone subsidy," said Elliot Noss, CEO of Ting, a new no-contract carrier that bills customers based on their usage each month.

Carrier Subsidies.  As a result, Americans usually get a reduced price for the telephones, but pay higher service fees.  See Carrier Subsidies ("[C]ustomers don't realize the actual costs of smartphones they're buying because they're included in the costs of their data plan and fees associated with their contract.").  Although the demand for prepaid telephones in the United States is increasing, "prepaid accounts still represent less than a quarter of all wireless service plans . . . ."  Troy Wolverton, Plans Could Bite Apple, Albuquerque Journal, October 11, 2013, at B2.

Ferdman recognizes that companies "bundle[] the phones to service contracts" and says that companies "tend[] to use the cell phone pricing as a come-on."  Reply ¶ 14, at 7-8.  He argues that the Court should not consider the profits Sprint would have made from the service contract accompanying the telephones Ferdman fraudulently obtained, because "there are anti-trust laws against predatory bundling."  Reply ¶ 14, at 7.  See Tr. 51:5-16 (Butcher)(arguing that it would be illegal under the Sherman Antitrust Act, 15 U.S.C. §§ 1-7, to price the cellular telephones below market to get a service contract, and so the Court should apply the actual price paid, because there is no evidence that price does not make Sprint whole)

A tying arrangement is one where a party agrees "to sell one product but only on the condition that the buyer also purchases a different (or tied) product . . . ."  Eastman Kodak Co. v.

Image Technical Services, Inc., 504 U.S. 451, 461 (1992).  This arrangement "violates § 1 of the Sherman Act if the seller has appreciable economic power in the tying market and if the arrangement affects a substantial volume of commerce in the tied market."  Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. at 462 (internal quotations and citations omitted).  While it may be theoretically possible that, under some circumstances, selling cellular telephones below cost and recouping the loss through service contracts could violate antitrust laws, the industry's actual, current practice, if it is also Sprint's model, is legal.  Arguments that this pricing structure is illegal under federal antitrust laws have fallen short.  See In re Wireless Telephone Servs. Antitrust Litig., 385 F. Supp. 2d at 404 (granting summary judgment on tying claim because plaintiffs did not present evidence that any one of the five telecommunications company defendants had a sufficient degree of market power or that any of the defendants' pricing schemes of requiring customers to purchase an approved handset in order to subscribe to the telephone services had an actual adverse effect on competition); T-Mobile USA, Inc. v. Wireless Exclusive USA, LLC, No. 3:08-CV-0340-G, 2008 WL 2600016, at *3 (N.D. Tex. July 1, 2008)(rejecting arguments that T-Mobile violated antitrust laws by conditioning the sale of prepaid phones on subsequent purchase of T-Mobile minutes for use on the phone, because the party so alleging failed to sufficiently plead that the amount of interstate commerce in the tied product was substantial); Cel-Tech Communications, Inc. v. L.A. Cellular Telephone Co., 973 P.2d 527, 588 (Cal. 1999)(Baxter, J., concurring in part and dissenting in part)(noting that selling cellular telephones below cost and recovering the losses through service contracts "might not violate federal antitrust law" although it may violate broader California state antitrust laws, the only violations alleged in the case).  There is no evidence in the record by which the Court

could soundly find that Sprint's practice is significantly different from that of T-Mobile and other wireless companies so that its practice would violate federal antitrust laws. Accordingly, Sprint's practice is neither a mystery nor illegal.

The Court finds that the retail value of the telephones is what Ferdman now calls the "list" price, with values between $449.99 and $549.99 for the cellular telephones. Sprint refers to these amounts as the "retail" prices of the telephones. Sprint Letter at 1-2. Although Ferdman asserts that the sales receipts show a lower price paid, the receipts also show that he received a "flat rate activation discount." Receipts at 16. There is no evidence that Ferdman activated the cellular telephones, indicating that he fraudulently obtained the discount. This fraud prevented Sprint from receiving any of the profits it was expecting from the service contract.

The Guidelines require the Court to calculate loss based upon the greater of actual loss or intended loss, with the actual loss being the "reasonably foreseeable pecuniary harm," meaning "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1, cmt. n.3. Although Ferdman may have intended for Sprint only to lose the value of the cellular telephones reflected in the purchase price, given that the purchase price included a discount for a service contract, it is reasonably foreseeable that, through fraudulently purchasing the cellular telephones and not entering into a service contract, Sprint lost both the value of the cellular telephones and the value of its benefit in the service contract, an amount which the receipts indicate is deducted from the retail price through the discount. The full retail price is, therefore, a reasonable estimation of Sprint's loss from both the cellular telephones and the loss of the service contracts.

An additional reason to use the full retail value is that Ferdman was engaged in a scheme to not only fraudulently obtain cellular telephones, but to then resell those phones.  In United States v. Gregoire, 638 F.3d 962 (8th Cir. 2008)(Loken, J.), the defendant stole merchandise from a sporting goods store called Reed's Family Outfitters, and then sold the items via eBay for less than the suggested retail value, sometimes even lower than the wholesale value.  See 638 F.3d at 965.  The PSR in that case calculated nearly $200,000.00 worth of merchandise seized from the defendant's home or mother's home, and over $150,000.00 in eBay sales, but because of Reed's "incredibly sloppy inventory practices," the United States could prove only $5,000.00 to $10,000.00 loss at trial.  638 F.3d at 970.  The district court nonetheless found a loss amount over $200,000.00 for sentencing purposes.  See 638 F.3d at 970.  The Eighth Circuit affirmed this calculation, noting that, because the damage from fraud can be difficult to calculate, "the district court need only make a reasonable estimate of loss rather than a precise determination." 638 F.3d at 970 (quoting United States v. Agboola, 417 F.3d 860, 870 (8th Cir. 2005)).  In affirming, the Eighth Circuit found the eBay sales especially persuasive: "Every sale of merchandise stolen from Reed's was a lost sale of that item for Reed's.  Every sale at a cut-rate price of Reed's merchandise that [defendant] obtained by barter may have deprived Reed's of the sale, and at a minimum injured Reed's by undercutting the market price."  638 F.3d at 970. Likewise, in Ferdman's case, using the full retail value is an appropriate calculation of Sprint's loss considering Ferdman's scheme involved reselling the telephones, even if the impact on Sprint may have been less profound than the impact on Reed's.

Using the full retail value of the cellular telephones fraudulently obtained from May 8 to May 25, 2011, Sprint's loss is $63,035.16.  See PSR ¶ 28, at 9.  Ferdman objects to the inclusion

of the telephones from May 8 to May 14, 2011, because no receipts have been provided for those transactions.  See Objections ¶ 28, at 9.  He argues that the government has not proven those losses by a preponderance of the evidence.  See Objections ¶ 29, at 9.  Neither the USPO nor the United States responded to this argument, in its written responses or at the hearing.  Ferdman concedes, however, that, if the full retail value is used for the loss calculation, inclusion of the cellular telephones from May 8 to May 14 does not affect the sentencing level.  See Tr. 63:12-21 (Butcher).  Section 2B1.1 provides for a 6-level enhancement if the loss is more than $30,000.00 and up to $70,000.00.  See U.S.S.G. § 2B1.1(b)(1)(D).  If the contested transactions are included, the total merchandise loss to Sprint is $63,035.16, but if excluded, the loss is $45,035.59.[6]  See PSR ¶ 28, at 9.

The Court may rely on the facts stated in the PSR unless the defendant files an objection.  See United States v. Ary, 518 F.3d 775, 787 (10th Cir. 2008).  "When a defendant objects, the government must prove that fact at the sentencing hearing by a preponderance of the evidence."  United States v. Ary, 518 F.3d at 787.  Ferdman properly objected to the PSR's including the cellular telephones from May 8 to May 14, 2011, but the United States did not introduce any evidence regarding that objection.  The letter from Sprint does not address these amounts.  See Sprint Letter at 1.  Without any evidence, the Court cannot find that the United States has carried its burden.  The Court will sustain Ferdman's objection to the inclusion of fraudulently obtained cellular telephones from May 8 to May 14, 2011.  This deduction lowers Sprint's total merchandise loss to $45,035.59.

---

[6] Ferdman also argues that the PSR incorrectly calculated the total amount of loss between May 15, and May 25, 2011.  See Objections at ¶ 37, at 12.  The Court overrules this objection, because the PSR accurately calculated this amount as $45,035.59.

Ferdman also asserts that the $300.00 which the PSR includes in its loss calculation for shipping costs is "unreasonable, especially without receipts."  Objections ¶ 33, at 11.  Ferdman asserts that the cost of shipping is built into the price of cellular telephones and, therefore, adding the shipping cost into his loss amount is inappropriate double counting.  See Objections ¶ 34, at 11.  Ferdman has provided no evidence to support this assertion, and the USPO has provided a letter from Sprint indicating that it suffered $300.00 in shipping costs, which was necessary to replace the fraudulently obtained cellular telephones.  See Sprint Letter at 1.  Shipping would normally be included in the retail cost of the telephones, but Sprint indicated that the shipping costs it listed are associated with replacing the fraudulently obtained cellular telephones and not for the shipping costs it would have incurred to send the telephones to the Sprint stores in the first place.  While Sprint may recover these costs if it sells the new telephones, there is no guarantee that the new telephones have been or will be sold.  Thus, Sprint has legally incurred the expense, and there is no proof that it has recovered or will recover the expense.  The Court determines that this information from Sprint demonstrates by a preponderance of the evidence that, in addition to the cellular telephones' retail value, Sprint suffered $300.00 in shipping costs because of Ferdman's conduct.  The Court, accordingly, overrules this objection to the PSR.  The total loss to Sprint under U.S.S.G. § 2B1.1 is $45,335.59.

The Court overrules Ferdman's objection that he should not receive a 6-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(D) for having caused losses in excess of $30,000.00 but less than $70,000.00.

-30-

## II.   THE COURT WILL OVERRULE FERDMAN'S OBJECTIONS TO THE RESTITUTION CALCULATION UNDER THE MVRA.

When a defendant causes "damage to or loss or destruction of property of a victim," the MVRA requires the defendant to either return the property or, if return is impossible, impractical, or inadequate, to pay "the value of the property on the date of the damage, loss, or destruction . . . ."   18 U.S.C. § 3663A(b).   The Court must resolve any dispute regarding the proper amount or type of restitution by a preponderance of the evidence.   See 18 U.S.C. § 3663(e).   The United States must carry the "burden of demonstrating the amount of the loss sustained by a victim as a result of the offense . . . ."   18 U.S.C. § 3664(e).

The United States invites the Court to use the full retail value in determining the "value of the property" for restitution purposes, while Ferdman argues that the actual price paid is a more accurate appraisal of the cellular telephones' value.   See Response at 6; Reply ¶ 19, at 8. The Tenth Circuit has recognized a split, or at least an apparent split, among the United States Courts of Appeals on the issue whether a restitution award under the MVRA or the analogous VWPA[7] may properly include lost profits for property damage.   See United States v. Wilfong, 551 F.3d 1182, 1185-86 (10th Cir. 2008)(McConnell, J.).   Because the Tenth Circuit has not directly answered this question, a preliminary issue is whether the Court may properly consider lost profits in a restitution award for property damage under the MVRA.   Although the parties did not argue this issue, the Court determines that it is necessary to resolve the question, because awarding Sprint the cellular telephones' retail value would include the profits Sprint would have made had it sold those telephones.   The next issue is whether the retail value of the cellular

---

[7] As discussed in the Relevant Law Regarding Restitution section, supra at 11-15, the MVRA and VWPA are nearly identical in authorizing an award of restitution, and, thus, cases interpreting one statute are persuasive in interpreting the other.

telephones fraudulently obtained is the proper measure for restitution in this case.   For the restitution calculation, the final issue is whether the United States has produced enough evidence regarding Sprint's shipping and investigative costs to satisfy its burden of proof and to include those amounts in the restitution award.   The Court will answer all three questions affirmatively and, thus, will overrule Ferdman's objections to the restitution award.

### A.   COURTS MAY USE LOST PROFITS IN CALCULATING RESTITUTION AWARDS UNDER THE MVRA PROPERTY DAMAGE PROVISIONS.

In United States v. Wilfong, the defendant called an Air Force Base and falsely reported that there was a bomb in one of the buildings, resulting in that building being evacuated for several hours.   See 551 F.3d at 1183.   The defendant pled guilty to calling in the bomb threat and agreed to pay restitution to the government.   See 551 F.3d at 1183.   The district court ordered $475,631.00 in restitution, the bulk of which was for lost employee work hours that the evacuation caused.   See 551 F.3d at 1183.   The defendant challenged this amount, arguing that "restitution for employee work hours is tantamount to restitution for 'lost income' and is not authorized by the MVRA."   551 F.3d at 1184.   The Tenth Circuit affirmed the restitution award, because "[a]n employee's work time is the property of the employer."   551 F.3d at 1184.   The Air Force Base lost the value of that property

> just as surely as a printing plant would lose the value of its property if an arsonist struck a match to its paper supply.   Value was destroyed.   The property could not be returned.   There would be no question, in the arson case, that restitution should include the value of the paper that was destroyed.   In this case, the cost of the lost employee work time should similarly be included in the restitution order.

551 F.3d at 1184.   The Tenth Circuit viewed the restitution award for the lost employee hours as awarding the Air Force Base the value of its damaged or lost property.   See 551 F.3d at 1184.

-32-

The Tenth Circuit noted, however, a potential conflict in the United States Courts of Appeals whether the MVRA and the VWPA allow a restitution award to include lost income or lost profits in a property damage case.  See 551 F.3d at 1185-86.  The alleged split is based on the MVRA's language, which provides different guidelines for calculating restitution when the offense results in property damage versus bodily injury.  See United States v. Wilfong, 551 F.3d at 1185; 18 U.S.C. § 3663A.

When an offense results in "damage to or loss or destruction of property of a victim of the offense," the restitution order shall require that the defendant:

> **(A)** return the property to the owner of the property or someone designated by the owner; or
>
> **(B)** if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to--
>
>> **(i)** the greater of--
>>
>>> **(I)** the value of the property on the date of the damage, loss, or destruction; or
>>>
>>> **(II)** the value of the property on the date of sentencing, less
>>
>> **(ii)** the value (as of the date the property is returned) of any part of the property that is returned;

18 U.S.C. § 3663A(b)(1).  When an offense results in "bodily injury to a victim," the statute provides that the restitution order shall require the defendant to

> **(A)** pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;
>
> **(B)** pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

-33-

       **(C)** reimburse the victim for <u>income lost</u> by such victim as a result of such offense;

18 U.S.C. § 3663A(b)(2) (emphasis added).  While the provisions for bodily injury specifically mention lost income in the calculation, <u>see</u> 18 U.S.C. § 3663A(b)(2)(C), there is no provision for lost income in the provisions for property damage, <u>see</u> 18 U.S.C. § 8663A(b)(1).  As the Tenth Circuit noted, "[s]ome courts have inferred from this statutory difference that Congress has not authorized (and therefore has impliedly prohibited) restitution for lost income or lost profits in property damage cases," while "[o]ther appellate decisions are in seeming conflict."  <u>United States v. Wilfong</u>, 551 F.3d at 1185.[8]  The Tenth Circuit avoided deciding whether the cases were in conflict, because it determined that the restitution award for lost employee work time was "not economically equivalent to compensating for lost profits or income."  <u>United States v. Wilfong</u>, 551 F.3d at 1186.  "The restitution award did nothing more than give the government compensation for the cost of the property that was destroyed by Mr. Wilfong's actions.  In accounting terms, the restitution order compensated for the cost of an input that was destroyed, not for the diminution in future income."  <u>United States v. Wilfong</u>, 551 F.3d at 1186.  The restitution award reimbursed the Air Force Base for the employee work hours that it paid for but did not receive.  <u>See</u> 551 F.3d at 1186.

---

[8] Section (b)(4) of the MVRA authorizes courts to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."  18 U.S.C. § 3663A(b)(4).  The authorization for lost income in this section relates only to the "investigation or prosecution of the offense or attendance at proceedings related to the offense," and does not answer the question whether courts may properly award lost income or lost profits relating to the property damage but not associated with the investigation or prosecution of the offense.

The United States argues that the Court should award Sprint restitution by valuing the merchandise that Ferdman fraudulently obtained at full retail value. This request raises the question whether a restitution award may ever include lost profits, which leads the Court to analyze the potential split that the Tenth Circuit recognized in United States v. Wilfong.

The Fourth and Fifth Circuits have held that a restitution award may not include lost income. In United States v. Mitchell, 876 F.2d 1178 (5th Cir. 1989)(Gee, J.),[9] the defendant was convicted for possessing three stolen Mack trucks. See 876 F.2d at 1180. The district court ordered restitution for the value of the stolen trucks, but also awarded the victims the amount of lost income for the time they did not have their trucks, calculated by multiplying the daily earnings the victims would have received from the use of the trucks by the number of days the defendant illegally held the trucks. See 876 F.3d at 1183. On appeal, the defendant argued that the district court erred in awarding lost income, because the statute did not authorize restitution for lost income for property damage, compared to the provisions for bodily injury, which authorized awarding lost income. See 876 F.2d at 1183. The government argued that the statute "merely provides an illustrative list of what the court may choose to order when it is determined that restitution is appropriate in any given case" and that the statute's purpose, "i.e., doing all possible to assist victims," would be "thwarted by denying lost compensation." 876 F.2d at 1183 (internal quotation marks omitted). The Fifth Circuit reversed:

> The fact that the goals of the Act may be thwarted by denying lost income restitution does not authorize us to ignore the plain language of the statute. Congress is clearly capable of authorizing restitution for lost income when it chooses to do so. Despite this fact, it has not included lost income in the type of restitution that may be ordered in property cases and, unless and until it amends

---

[9] The Fifth Circuit decided this case under the VWPA, but it is persuasive in interpreting the MVRA. See Relevant Law Regarding Restitution discussion, supra at 11-15.

the statute to include lost income, courts may not order such restitution in property cases.

United States v. Mitchell, 876 F.2d 1178, 1183 (5th Cir. 1989).

In United States v. Sharp, 927 F.2d 170 (4th Cir. 1991)(Ervin, J.),[10] the defendants were convicted for setting off homemade pipe-bombs in a mine, destroying an exhaust ventilation fan and damaging the mine.  See 927 F.2d at 171-72.  The district court ordered restitution for costs in repairing the mine as well as "loss of income," 927 F.3d at 173, although as the Tenth Circuit noted in analyzing the Fourth Circuit's decision, "[i]t is not clear from the appellate opinion how this loss was measured," United States v. Wilfong, 551 F.3d at 1185.  The defendants argued that the inclusion of lost income was improper, and the Fourth Circuit agreed.  See United States v. Sharp, 927 F.2d at 173-74.  After explaining that the VWPA's provisions for property damage did not include lost income, the Fourth Circuit cited United States v. Mitchell, saying that if Congress wanted to include lost income, it could have done so in the statute.  United States v. Sharp, 927 F.2d at 174.  "Based on the plain language of the statute, the district court should not have included lost income in the calculation of restitution."  927 F.2d at 174.

In United States v. Wilfong, the Tenth Circuit compared these two cases from the Fourth and Fifth Circuits with decisions from the Second and Sixth Circuits, noting that "[o]ther appellate decisions are in seeming conflict."  551 F.3d at 1185.  In United States v. Milstein, 481 F.3d 132 (2d Cir. 2007)(Rakoff, J.),[11] the defendant distributed misbranded drugs in violation of

---

[10]  The Fourth Circuit decided this case under the VWPA, but it is persuasive in interpreting the MVRA.  See Relevant Law Regarding Restitution discussion, supra at 11-15.

[11]  The Second Circuit decided this case under the VWPA, but it is persuasive in interpreting the MVRA.  See Relevant Law Regarding Restitution discussion, supra at 11-15.

trademark law.  See 481 F.3d at 133.  In valuing the property that the victim lost, the district

court based its restitution order on the sales that the two drug companies would have made had

the defendant actually purchased the products from them for distribution.  See 481 F.3d at 135.

The Second Circuit affirmed the restitution award, finding that "the standard measure for

determining the value to the victim of infringed trademarks is the victim's lost sales."  481 F.3d

at 137.  Rejecting the Fourth and Fifth Circuits' logic, the Second Circuit said that courts which

interpret the restitution statute to prohibit lost income for property damage "confuse the loss of

income suffered by a victim of personal injury with the very different notion of lost profits as a

measure of loss suffered by a victim of misappropriation of property."  481 F.3d at 136.  The

Second Circuit stated: "Nothing in the text or legislative history of the VWPA precludes

restitution for lost profits under section 3663(b)(1) where such losses amount to the 'value of the

property' the victim lost."  481 F.3d at 136.  The Second Circuit said that holding otherwise

could thwart Congress' purpose.  See 481 F.3d at 136.

The Sixth Circuit, in United States v. Lively, 20 F.3d 193 (6th Cir. 1994)(Zatkoff, J.),[12]

said that, while the property damage provisions do not expressly mention "lost income" like the

bodily injury provisions do, it is "significant" that neither the act "nor its legislative history

expressly foreclose the district court from ordering restitution in the amount that would cover a

company's actual losses," which in that case was the retail price.  20 F.3d at 202.  The defendant

had ordered merchandise through mail-order retailers, failed to pay for the merchandise, and

resold the merchandise at flea markets.  See 20 F.3d at 195.  The district court ordered restitution

based on the retail value of the goods that the defendant fraudulently obtained rather than on the

---

[12] The Sixth Circuit decided this case under the VWPA, but it is persuasive in interpreting
the MVRA.  See Relevant Law Regarding Restitution discussion, supra at 11-15.

manufacturing costs or wholesale costs.  See 20 F.3d at 200.  The Sixth Circuit affirmed, holding that, after the defendant victimized the mail-order companies, they no longer had the merchandise to sell at the retail price level.  See 20 F.3d at 202.  The Second Circuit stated: "The ordinary meaning of 'restitution' is restoring someone to a position he occupied before a particular event."  20 F.3d at 202 (quoting Hughey v. United States, 495 U.S. 411, 416 (1990).  Looking to the legislative history, the Sixth Circuit said the principle behind restitution is to "insure that the wrongdoer is required to the degree possible to restore the victim to his or her prior state of well-being."  United States v. Lively, 20 F.3d at 202 (citation omitted).

> Moreover, in order to restore the mail order companies to their prior state of well being the order of restitution had to include their lost profits.  Before Lively victimized these companies, they had merchandise that could be sold at the retail price level.  After Lively victimized these companies, they no longer had this merchandise to sell at the retail price level.  Lively precluded these companies from being able to realize the profits of their labor.  Thus, including lost profits in the order of restitution was the only way to assure the restoration of these victims to their prior state of well being.

20 F.3d at 202-03.

In United States v. Wilfong, the Tenth Circuit left open the question "whether the two lines of precedent are in genuine conflict [and], if they are, which is correct."  551 F.3d at 1186 ("Fortunately, in this case we need not determine whether the two lines of precedent are in genuine conflict or, if they are, which is correct.").  It avoided the issue by determining that the district court's restitution award including lost employee work hours "did nothing more than give the government compensation for the cost of the property that was destroyed by Mr. Wilfong's actions."  551 F.3d at 1186.  The Tenth Circuit gave a hypothetical that would require analyzing the split more closely:

> If the district court had ordered Mr. Wilfong to pay for the value of the product the employees would have created if they had been able to work (whatever that would be), Mr. Wilfong might have a point. If a widget factory were shut down by a bomb threat, there would be a difference between restitution based on the hourly wages of the workers versus restitution based on lost profits from reduced widget production. Under the logic of <u>Mitchell</u> and <u>Sharp</u>, restitution based on the latter would arguably be impermissible.

551 F.3d at 1186. Although different from the situation before the Court today, this hypothetical and variations on this hypothetical shed light on the issue. If a court ordered restitution based on the lost profits from reduced widget production in the hypothetical, the court would not just be valuing the property, but would be going beyond the property damaged and looking at the hypothetical widgets the factory would have produced and sold. This situation is a different one than if, instead of losing work time from a bomb threat, the defendant set off a bomb and destroyed the widget factory. In that case, a court could value the widget factory as well as any widgets that the defendant destroyed. The court would have to decide what value to place on the widgets -- whether to limit the value to the widget factory's costs in producing the widgets, or whether to consider the value of the widgets in the market. <u>Black's Law Dictionary</u> defines "value" as "[t]he monetary worth or price of something; the amount of goods, services, or money that something commands in an exchange." <u>Black's Law Dictionary</u> 1336 (9th ed. 2010). If the widget factory sold the widgets to retailers, then the value of the widget to the widget factory would be the wholesale price, which would include the factory's cost plus the profit it would have obtained in selling the widgets. If the widget factory sold the widgets directly to consumers, then the court could use the retail value.

Looking at the issues in this light, the Court concludes that the two lines of precedent are not in conflict. The Fourth and Fifth Circuits were correct to reverse restitution awards based on

lost income, because the lost income awards were in addition to the value of the property that was damaged or destroyed.  Courts do not have inherent power to order restitution, but may do so only when a statute authorizes the award.  See United States v. Harwood, 854 F. Supp. 2d at 1051 (citing United States v. Gordon, 480 F.3d at 1210).  When property has been damaged or destroyed, the MVRA authorizes a court to award only the value of the property.  See 18 U.S.C. § 3663(b)(1).  As the Second and Sixth Circuits indicated, using the retail value, fair market value, or lost sales may be the most accurate measure of the value of property related to a victim's losses, and may best return the victim to the pre-offense position.  Valuing the property in a way that includes lost profits is a different concept than awarding the victim lost income over and above the value of the property.  The Fourth and Fifth Circuits would likely agree. After the Fourth Circuit decided United States v. Sharp in 1991, it held in United States v. Wright, 176 F. App'x 373 (4th Cir. 2006)(unpublished)(per curiam), that the district court "did not abuse its discretion in using the retail value of the stolen handguns as the measure of the value of the firearms for purposes of restitution" even though the defendant stole the firearms from a business that would have made a profit by selling the firearms at retail price.  See 176 F. App'x at 375.  Likewise, after the Fifth Circuit decided United States v. Mitchell in 1989, it held in United States v. Beydoun, 469 F.3d 102 (5th Cir. 2006)(Jones, C.J.), that "the appropriate measure" for the victim's losses when the defendant sold counterfeit cigarettes infringing on the victim's copyright and sales was "lost net profit."  469 F.3d at 108.  Neither the Fourth nor the Fifth Circuit mentioned its earlier decision that the applicable restitution statute precluded awarding lost income in property damage cases, likely because it recognized the difference in awarding lost income and valuing the damaged property using lost profits.  The Court concludes

-40-

that Congress did not intend to foreclose the possibility of including lost profits in valuing property under the MVRA.

Although the Tenth Circuit has not directly addressed this point, two Tenth Circuit cases support the Court's position: United States v. Hudson, 483 F.3d 707 (10th Cir. 2007)(McKay, J.), and United States v. James, 564 F.3d 1237 (10th Cir. 2009)(Brorby, J.). These cases also indicate that, even if there is a genuine conflict between the circuits, the Tenth Circuit would permit including lost profits in valuing the property under the MVRA.

The defendant in United States v. James was convicted for fraudulently obtaining homes and home loans, receiving the money from lenders for improvements and never paying the loans, and causing foreclosure on the homes at a financial loss to the mortgage holders. See 564 F.3d at 1239. In trying to determine the correct amount of restitution, the Tenth Circuit needed to determine whether the district court should offset the mortgage holders' losses by the amount the homes sold for at the foreclosure sale or by the fair market value of the homes. See 564 F.3d at 1245. The defendant argued for the fair market value, which was higher and would result in a lower restitution award. See 564 F.3d at 1245. The Tenth Circuit rejected this argument because "that measure would not have as closely represented the calculation of actual loss incurred by" the victim. 564 F.3d at 1246 (internal quotation marks and emphasis omitted). In coming to this conclusion, the Tenth Circuit relied on United States v. Boccagna, 450 F.3d 107 (2d Cir. 2006)(Raggi, J.). "As the Second Circuit suggests, § 3663A generally uses the term 'value,' and does not limit calculation of 'value' only to the use of the 'fair market value' of the property at issue." United States v. James, 564 F.3d at 1245. In United States v. Boccagna, the Second Circuit had prefaced this statement by saying that, "[i]n most circumstances, fair market

value will be the measure most apt to serve this statutory purpose" of making victims of crime whole, "to fully compensate these victims for their losses and to restore these victims to their original state of well-being." 450 F.3d at 115 (internal quotation marks and citations omitted). "Because this price reflects the value of property's greatest economic use, it generally provides the most reliable measure of both the full loss sustained by a victim when his property is damaged, lost, or destroyed, and the degree to which that loss is mitigated by recouped property." 450 F.3d at 115-16.

In United States v. Hudson, the defendant attempted to sell counterfeit Microsoft Corporation software to a Maryland company. See 483 F.3d at 708. The Maryland company was suspicious of the software it received, contacted Microsoft Corporation, confirmed its doubts as to the software's authenticity, and turned over the counterfeit software to the government. See 483 F.3d at 708. The district court ordered restitution based on the estimated retail price for the counterfeit software. See 483 F.3d at 408. The Tenth Circuit reversed, because there was no evidence that the defendant's conduct caused Microsoft Corporation to lose any sales. See 483 F.3d at 710-11. In a footnote, the Tenth Circuit noted that "[r]estitution must be based on net lost profits, not on total retail price." 483 F.3d at 710 n.1. This comment indicates that the Tenth Circuit would affirm a restitution award that includes lost profits in valuing property under the MVRA, even though the MVRA does not specifically list "lost profits" in the provisions authorizing restitution for property damaged, lost, or destroyed. Although the Tenth Circuit decided United States v. Hudson before it recognized a potential circuit split in United States v. Wilfong, it remains binding precedent. Unless there is en banc review or a superseding contrary decision by the Supreme Court of the United States, prior decisions remain binding. See United

States v. Serawop, 505 F.3d at 1123; Mendiola v. Holder, 585 F.3d 1303, 1310 (10th Cir. 2009), overruled on other grounds by Contreras-Bocanegra, 678 F.3d 811 (10th Cir. 2012). "Moreover, the precedent of prior panels which we must follow includes not only the very narrow holdings of those prior cases, but also the reasoning underlying those holdings, particularly when such reasoning articulates a point of law." Mendiola v. Holder, 585 F.3d at 1310 (internal quotation marks and brackets omitted), overruled on other grounds by Contreras-Bocanegra, 678 F.3d 811 (10th Cir. 2012).

The Court is convinced that, if the Tenth Circuit were faced with this potential split in authority again, it would find that the two lines of precedent are not in genuine conflict and that courts may include lost profits in valuing the property damaged, lost, or destroyed, but that courts may not award lost income in addition to the value of the property. While the Court agrees with the Fourth and Fifth Circuits that federal courts must be faithful to the MVRA's language and cannot add the term "lost income" to Section 3663A(b)(1) relating to damaged property when that term appears only in Section 3663A(b)(2) relating to bodily injury, there is a difference between including lost profits in valuing property, versus awarding lost profits or lost income that results from the loss of property. Congress did not intend the courts -- when determining the value -- to ignore the market value of a lost good and give it some other value, such as manufacturing cost, even if the market value includes the victim's lost profits. As the Second Circuit noted, the fair market value "generally provides the most reliable measure of . . . the full loss sustained by a victim when his property is damaged, lost, or destroyed . . . ." United States v. Boccagna, 450 F.3d at 115. Even if the cases are in conflict, the Tenth Circuit has indicated that courts may award lost profits to victims of trademark infringement, and the Court

does not see why victims of stolen or fraudulently obtained property should be treated less fairly. The Court believes that it can lawfully include lost profits when valuing property that was damaged, lost, or destroyed.

### B.   THE COURT WILL USE THE FULL RETAIL VALUE IN CALCULATING THE RESTITUTION AWARD.

The next question is whether the full retail price[13] is the accurate measure for restitution in this case. Ferdman argues that it is not the correct standard, because the full retail price would over-compensate Sprint for telephones it would sell for much less. See Objections ¶ 26, at 8-9. The United States argues that the retail price is the correct measure, not only because other Courts of Appeals have held that restitution for property damage may be based on lost profits, but also because Ferdman resold the phones he fraudulently obtained, creating a "small but perceptible effect on Sprint's sales and profits." Response, at 7. The Court will overrule Ferdman's objection and apply the full retail price as the measure of property damage under the FMVA.

As an initial note, the Court recognizes that there are several cases involving restitution where Courts of Appeals have required the district court to base the award on net lost profits rather than the total retail price. Taken out of context, these cases would appear to indicate that the Court's award based on the full retail value is incorrect, but because these cases involve

---

[13] As explained in Section I of the Analysis, supra at 23-27, the "retail" price is what Ferdman calls the "list" price, and reflects prices between $449.99 and $549.99. The Court has determined that these higher prices more accurately reflect the retail price of the cellular telephones because of the business model in subsidizing the cellular telephones and pairing them with service contracts. This section incorporates that analysis and will focus on whether this retail value is the correct measure for restitution, or if the lower prices, ranging between $149.99 and $199.99, is correct. Ferdman refers to these lower amounts as the actual price paid, even though Ferdman did not pay for the cellular telephones but charged them to someone else's account.

counterfeit products, and trademark and copyright violations, they do not apply in a situation where the defendant has stolen or fraudulently obtained merchandise. For example, in United States v. Hudson, 483 F.3d 707 (10th Cir. 2007)(McKay, J.), the defendant sold counterfeit copies of Microsoft Office to a Maryland company. See 483 F.3d at 708. The company, after receiving the software, suspected that it might be counterfeit. See 483 F.3d at 708. The company refused to pay for the software, contacted Microsoft Corporation and turned over all copies of the software it had received to the government. See 483 F.3d at 708. The district court ordered the defendant to pay Microsoft Corporation restitution for the full retail value of the 537 copies of counterfeit software the defendant attempted to sell to the Maryland company. See 483 F.3d at 709. The Tenth Circuit reversed, because there was no evidence that "any sales were diverted from Microsoft Corporation by Defendant's actions." 483 F.3d at 710-11. The Tenth Circuit said in a footnote that, even if the government had proven that the defendant diverted sales, the correct measure would be "based on net lost profits, not on total retail price" of the software. 483 F.3d at 710 n.1 (citing United States v. Beydoun, 469 F.3d at 108). Likewise, the defendant in United States v. Beydoun was convicted for selling counterfeit cigarettes, and the Fifth Circuit said that the correct measure for restitution in such a case was the net lost profit per unit multiplied by the number of counterfeit goods actually placed into commerce. See 469 F.3d at 108. The Fifth Circuit refused to award restitution for the counterfeit cigarettes which were not placed into commerce, and also refused to apply the full retail value of the cigarettes. See 469 F.3d at 107-08. In cases involving counterfeit products, the victim companies do not incur their normal operating expenses in creating, storing, or selling the products -- they only suffer the

loss of diverted sales, and so the proper measure for restitution is the lost net sales, not the full retail value.  As the Eighth Circuit has noted:

> [R]estitution to a legitimate seller for harm caused by counterfeit goods is not analogous to restitution to a seller for goods that were stolen through fraud.  A legitimate seller is harmed by a counterfeit good only when that product enters the market; a seller who is fraudulently deprived of his goods is harmed as soon as those goods are stolen.

United States v. Robertson, 493 F.3d 1322, 1333 (11th Cir. 2007)(Pryor, J.).

In cases where the defendants steal or fraudulently obtain merchandise from a victim engaged in selling that merchandise to consumers, courts have used and affirmed the use of the full retail value as the correct measure of damages.  In United States v. Lively, the Sixth Circuit affirmed the district court's restitution award based on the goods' retail value when the defendant ordered merchandise from mail-order companies, never paid for the merchandise, and then resold the merchandise at flea markets.  See 20 F.3d at 195, 203.

> Before Lively victimized these companies, they had merchandise that could be sold at the retail price level.  After Lively victimized these companies, they no longer had this merchandise to sell at the retail price level.  Lively precluded these companies from being able to realize the profits of their labor.  Thus, including lost profits in the order of restitution was the only way to assure the restoration of these victims to their prior state of well being.

20 F.3d at 202-03.  Likewise, in United States v. Susel, 429 F.3d 782 (8th Cir. 2005)(per curium), the defendant stole copyrighted software from his workplace and sold the software on eBay.  See 429 F.3d at 783.  The Eighth Circuit affirmed the district court's restitution award, which "represented the retail value of the stolen software that was sold by Susel and his roommate on eBay (amounting to lost sales to the software company of $220,813.50)," plus administrative and transportation costs "incurred during participation in the investigation and prosecution of the offense."  429 F.3d at 784.  In United States v. Rice, 38 F.3d 1536 (9th Cir.

1994)(Goodwin, J.),[14] the defendant, Rice Aircraft, Inc., bribed another company's employees to provide excessive free samples and unauthorized price discounts for aircraft parts.  See 38 F.3d at 1544.  The Ninth Circuit affirmed the district court's restitution award based on the "book value" of the free samples fraudulently obtained, even though the book value included a profit markup.  38 F.3d at 1544.  "Had Rice not obtained the free samples, Hi-Shear would have sold them, for their book-value, either to Rice or to other customers.  Thus, the district court did not abuse its discretion in calculating restitution based on the samples' book value."  38 F.3d at 1544.

The Eleventh Circuit has developed a line of cases addressing the proper calculation method for restitution awards, looking to whether the items are "unique" or "fungible," as well as to whether the victim sells merchandise as a wholesaler or as a retailer.

First, in United States v. Shugart, 176 F.3d 1373 (11th Cir. 1999)(Dubina, J.), the Eleventh Circuit looked to the word "value" in § 3663A(b)(1) and determined that, for "fungible commodities, value is easy to determine: it's the actual cash value, or fair market value of the item -- that is, the fair or reasonable cash price for which the property could be sold in the market in the ordinary course of business."  176 F.3d at 1375 (internal quotations and brackets omitted). The Eleventh Circuit noted that, while the fair market value will often be accurate, there may be situations where it will be difficult to determine.  See 176 F.3d at 1375.  "Where actual cash value is difficult to ascertain -- because an item is unique, or because there is not a broad and active market for it -- replacement cost may be a better measure of value."  176 F.3d at 1375.

---

[14] The Ninth Circuit decided this case under the VWPA, but it is persuasive in interpreting the MVRA.  See Relevant Law Regarding Restitution discussion, supra at 11-15.

The district court had ordered restitution for the replacement cost of a church that the defendant had destroyed by arson, and the Eleventh Circuit affirmed that judgment as "the only effective way to return the victims the fair equivalent of what they lost . . . ." 176 F.3d at 1375.

The Eleventh Circuit applied these rules in United States v. Stamps, 201 F. App'x 759 (11th Cir. 2006)(per curium), where the district court awarded restitution for the retail value of jewelry stolen from a retail jewelry store. 201 F. App'x at 761. Because the defendant did not object to the district court's calculation, the Eleventh Circuit reviewed the award for plain error. See 201 F. App'x at 762. It affirmed the district court's calculation using the retail value of the jewelry, even though the defendant argued that jewelry is not a fungible commodity. See 201 F. App'x at 761-62.

In United States v. Robertson, 493 F.3d 1322 (11th Cir. 2007)(Pryor, J.), the defendant fraudulently obtained software from Novell, a software manufacturer, and resold it as though he were a distributor. See 493 F.3d at 1327-28. The district court awarded restitution based on the software units' wholesale price. See 493 F.3d at 1329. The Eleventh Circuit, applying United States v. Shugart, said that either the wholesale or the retail price of the software units would have been appropriate, because the units were fungible commodities, and because Novell sold the units both to distributors and to end users in the regular course of business. See 493 F.3d at 1333.

As Ferdman notes, cellular telephones are "economically fungible goods." Objections ¶ 20, at 7; Reply ¶ 14, at 6. "[I]t does not matter economically to Sprint if it sells one Samsung D720 phone over another to a customer." Objections ¶ 23, at 8. Ferdman argues that Sprint is both a wholesaler and a retailer, because it sells cellular telephone service bundled with the

cellular telephones.  See Reply ¶ 14, at 6-7.  Although Ferdman attempts to distinguish cases like

United States v. Stamps, where the merchandise was more unique, the full line of cases from the

Eleventh Circuit indicates that the retail value is a proper measure for restitution, because Sprint

sells a fungible commodity to end users.

The Court is cautious to take the Eleventh Circuit's clear-cut rules too far, because

restitution is aimed at restoring the victim "to a position he occupied before a particular event."

Hughey v. United States, 495 U.S. at 416.  There may be situations, as the Tenth Circuit

recognized in United States v. James, when the retail value will not reflect the value of the

property or the victim's losses.  As a starting point, the Court concludes that ordering restitution

for the full retail value of the cellular telephones that Ferdman fraudulently obtained is in line

with other court decisions in similar situations.  The Court has seen, however, two cases that

potentially conflict with awarding restitution based on the full retail value to Sprint.  First, in

United States v. Angelica, 951 F.2d 1007 (9th Cir. 1991)(Fletcher, J.),[15] the defendant persuaded

victims to send their loose diamonds to him to resell, but then he misappropriated the proceeds.

See 951 F.2d at 1008.  In awarding restitution, the parties agreed "that the victim's position in

the market is relevant in valuing converted property."  951 F.2d at 1010 (citing United States v.

Hughey, 495 U.S at 416 (recognizing that restitution restores a victim "to a position he occupied

before a particular event")).  The parties disagreed as to "where Angelica's victims were situated

in the market."  United States v. Angelica, 951 F.2d at 1010.  The defendant argued that the

victims were investors who would have purchased the loose diamonds at wholesale prices, but

the district court found, and the Ninth Circuit affirmed, that the victims would have purchased

_____

[15] The Ninth Circuit decided this case under the VWPA, but it is persuasive in
interpreting the MVRA.  See Relevant Law Regarding Restitution discussion, supra at 11-15.

the diamonds at retail prices.  See 951 F.2d at 1010.  This case seems to indicate that, if the victims purchased the property at wholesale prices, the restitution amount should be based on that wholesale value.  This case does not align with the restitution calculations the Court has seen in other situations, including from a later decision out of the same circuit.  In 1994, in United States v. Rice, the Ninth Circuit affirmed awarding restitution in the amount of the "book price" of aircraft parts that the defendant fraudulently obtained, even though the book price included a profit markup and the victim would have obtained the parts for substantially less.  38 F.3d at 1544.  Although it is not clear how to reconcile these two Ninth Circuit cases, one possibility is that, in United States v. Angelica, the victims were not in the business of selling the items fraudulently obtained, while the victim in United States v. Rice was in the business of selling the items.  Even if this reason does not explain the difference, the Court recognizes that United States v. Rice is more consistent with other courts' treatment of restitution awards when the victims are in the business of selling the merchandise that was fraudulently obtained or stolen.

The other case that creates potential conflict with the Court's restitution order is United States v. Chalupnik, 514 F.3d 748 (8th Cir. 2008)(Loken, C.J.).  BMG Columbia House sold CDs and DVDs by mail, and when the discs were undeliverable, BMG Columbia directed the United States Postal Service to discard the undeliverable discs, because it was less costly to discard the discs than to pay for shipping and restocking the discs.  See 514 F.3d at 750.  The defendant, who worked for USPS, took the undeliverable discs from the USPS trash and sold them to used record stores.  See 514 F.3d at 750.  The district court ordered restitution in the amount of the defendant's gross revenues.  See 514 F.3d at 751.  The defendant argued that "the government failed to prove that BMG suffered lost profits, or any other actual loss, as a result of

his committing the offense of conviction." 514 F.3d at 754. The Eighth Circuit agreed and reversed the restitution award. See 514 F.3d at 754. It rejected the government's argument that "the price at which Chalupnik sold the stolen discs is a reasonable, indeed conservative estimate of BMG's lost sales." 514 F.3d at 755. The Eighth Circuit went on to say that, "for goods held by a merchant for sale, lost profits rather than lost sales revenues are the proper measure of 'actual loss.'" 514 F.3d at 755. The Eighth Circuit did not cite any authority for this statement, but likened the defendant's conduct to counterfeit cases, because BMG Columbia destroyed rather than restocked undeliverable discs and so would not have resold the discs that the defendant wrongfully obtained. See 514 F.3d at 755. Although the language from this case regarding "goods held by a merchant for sale" would seem to require the Court to order restitution only for Sprint's lost profits rather than for lost sales revenue reflected in the full retail value, the Court believes this statement more accurately applies to counterfeit cases and unique situations where the victim company would not have sold the merchandise the defendant wrongfully obtained. In cases where the defendant fraudulently obtains merchandise that the victim company would otherwise sell, the Eighth Circuit would likely award the property's retail value, as the Eighth Circuit did in United States v. Gregoire. In that case, the Eighth Circuit remanded the restitution calculation to the district court because of a failure of proof regarding which items the defendant fraudulently obtained and which items he rightly obtained. See United States v. Gregoire, 638 F.3d at 974. In remanding, the Eighth Circuit said that "restitution may include the retail value of unsold stolen property if it cannot be returned . . . ." 638 F.3d at 974 (citations and emphasis omitted). Similarly, the Eighth Circuit had previously affirmed a restitution award based on the retail value of stolen software that the defendant stole

from his workplace and sold on eBay.  See United States v. Susel, 429 F.3d at 784.  These cases taken together persuade the Court that United States v. Chalupnik reflects the Eighth Circuit's view of counterfeit property cases and the unique facts where the victim would not otherwise sell the merchandise, rather than the situation that is before the Court today, namely, when a defendant fraudulently obtains merchandise from a company that would have sold that merchandise for retail value.

Although other courts' decisions indicate that the Court may award restitution based on the fair market value of the cellular telephones, the Court is mindful to analyze the specific facts of this case, looking to the value of the property that Sprint lost.  Ultimately, the Court must determine "the best measure of value for the purpose of calculating the actual loss in awarding restitution," keeping in mind the purpose of restitution is not "to punish defendants or to provide a windfall for crime victims, but rather to ensure that victims, to the greatest extent possible, are made whole for their losses."  United States v. James, 564 F.3d at 1246 (quoting United States v. Parker, 553 F.3d 1309, 1323 (10th Cir. 2009)).  The restitution order must not exceed the actual loss that the defendant's conduct caused, as that would be an illegal sentence constituting plain error.  See United States v. James, 564 F.3d at 1243.  This limitation is why restitution awards based on the defendant's gain, rather than the victim's loses, have been reversed.  See United States v. Galloway, 509 F.3d at 1253 (reversing restitution award based on defendant's gain and remanding for the district court to calculate the victim's actual loss)

In making the calculation, the Court does not have to hold an evidentiary hearing, but must give the defendant "notice and an opportunity to be heard on the restitution issue."  United States v. Rice, 38 F.3d at 1546.  The burden rests on the government, not on the defendant or on

the victim, to prove the amount of the victim's loss.  See United States v. Fair, 699 F.3d at 515

(citing 18 U.S.C. § 3664(e)).  If the government cannot carry its burden, or if the calculation is

too complex, "the MVRA envisions the appropriate path for a district court is to hold additional

proceedings or to decline to order restitution at all, not to issue an order unsupported by the

evidence."  United States v. Fair, 699 F.3d at 516 (citations omitted).  If a court finds that

"determining complex issues of fact related to the cause or amount of the victim's losses would

complicate or prolong the sentencing process to a degree that the need to provide restitution to

any victim is outweighed by the burden on the sentencing process," 18 U.S.C. § 3663A(c)(3)(B),

then the court may "opt out of imposing restitution," United States v. Galloway, 509 F.3d 1254.

The court should also consider rule 32(b)(1) of the Federal Rules of Criminal Procedure, which

requires the court to "impose sentence without unnecessary delay."  See also United States v.

Gallant, 537 F.3d 1202, 1254 (10th Cir. 2008)(noting that it is within the district court's

discretion to not award restitution if complex issues in "providing 'a fair and just order of

restitution' would be 'difficult and time consuming'").

Although the calculation must be rooted in the victim's actual loss, the calculation does

not need to be exact.  The Tenth Circuit has stated that, while a "restitution order must be

specific in a dollar amount that is supported by evidence in the record," the determination is "by

nature an inexact science."  United States v. James, 564 F.3d at 1247 (internal quotation marks

and citations omitted).  "[I]n the case of fraud or theft, the loss need not be determined with

precision.  The court need only make a reasonable estimate of the loss, given the information

available."  United States v. Gallant, 537 F.3d at 1252 (citation omitted).  For example, the Sixth

Circuit explained that, in using the retail value of the goods fraudulently obtained for the

restitution award, it avoided the "significant, time-consuming task" of "requiring the government

to establish the victims' out-of-pocket expenses." United States v. Lively, 20 F.3d at 203.

> At a minimum, in order to calculate such an amount, the following items would
> have to be examined: the cost of the goods; the expense incurred in storing the
> goods in a warehouse and retrieving the goods to be shipped when they are
> ordered; and the cost of sending the goods.

United States v. Lively, 20 F.3d at 203.  Using the retail value avoided turning the sentencing

"into a mini-trial, consuming the district court's precious and limited resources."  United States

v. Lively, 20 F.3d at 203.

The Court must resolve any disputes by a preponderance of the evidence.  See United

States v. Gallant, 564 F.3d at 1248.  To determine this amount, the Court "may consider

affidavits and letters by the injured party," as well as "other hearsay evidence that bears minimal

indicia of reliability so long as the defendant is given an opportunity to refute that evidence."

United States v. Reese, 998 F.2d 1275, 1282 (5th Cir. 1993).

The Court concludes that the full retail price is the correct measure of damages in this

case.  Cellular telephones are a fungible commodity and, had Ferdman not fraudulently obtained

the telephones, Sprint would have had them available to sell to other customers.  Sprint sells the

telephones to end users at retail value, and if not at this full value, at a subsidized price, relying

on the accompanying service contract and fees.  Ferdman prevented Sprint from receiving any of

these sales, which would have provided Sprint with the telephones' cost as well as overhead

operating expenses and profits.  The United States has produced enough evidence to establish by

a preponderance of the evidence that Sprint's actual losses include the full retail value of the

cellular telephones.  See Sprint Letter at 1 ("The phone losses are the retail unsubsidized price of

-54-

these phones.").[16]  The letter, as well as receipts from the various transactions, provided evidence

that the telephones' retail prices ranged from $449.99 to $549.99.  See Sprint Letter at 1-2;

Receipts at 2-3, 21.  The value of the cellular telephones fraudulently obtained between May 15

and May 25, 2011, is $45,035.59.  See PSR ¶ 62, at 15.

In a case involving counterfeit products, the Tenth Circuit said that "[r]estitution must be

based on net lost profits, not on total retail price."  483 F.3d at 710 n.1.  Although this statement

appears on its face to require the Court to award restitution based on net lost profits rather than

the total retail price, the Court believes the Tenth Circuit did not intend to apply that statement in

a case such as this one, because of the underlying principles in United States v. Hudson and the

dissimilar situation of the victims.  The principles behind this statement are that a "restitution

order must be based on actual loss" and that the goal of restitution is to "ensure that victims, to

the greatest extent possible, are made whole for their losses."  483 F.3d at 710.  Retail prices

reflect the expenses a company incurs in offering the merchandise for sale, such as

manufacturing or purchasing costs, storage, shipping, employee wages, and other overhead costs,

in addition to the profit a company builds into the retail price.  In counterfeit cases, like United

---

[16]While Ferdman asked in his Objections for a hearing on the amount of restitution if the Court imposed an amount greater than $20,714.67, he did not renew the request for an evidentiary hearing at the sentencing hearing.  Moreover, if Ferdman wanted to question McGough, he would have subpoenaed him to the sentencing hearing rather than just show up and argue the point.  While Ferdman does not bear the burden of proof, if he wanted to cross-examine the evidence, it was not solely the burden of the United States to bring its evidence in precisely the form that Ferdman wanted it; the question is whether the United States made its burden of proof by a preponderance of the evidence, and the Court finds the Sprint Letter, without anything to undermine it, satisfies that burden.  Moreover, the Court's only rationale for holding an evidentiary hearing would be to establish that McGough falsely represented Sprint's losses to the Court, and Ferdman's conjecture that the losses overstate Sprint's losses does not, alone, give the Court reason to believe that McGough lied to the Court.  The Court, accordingly, denies Ferdman's written request for an evidentiary hearing.

States v. Hudson, awarding net lost profits is a proper calculation because the victim did not incur any expenses in offering the counterfeit products for sale. The net lost profit is the only actual loss to a victim of counterfeited products, beyond any lost good will. Dissimilarly, in the present case, Sprint incurred expenses in bringing the cellular telephones to the market, and to award only net lost profits would undercompensate Sprint for its actual losses. Awarding only lost profits would place a loss -- the expenses Sprint incurred in offering cellular telephones for sale -- on Sprint rather than on Ferdman. Likewise, ordering restitution based on Sprint's expenses and ignoring any potential profit would also leave Sprint undercompensated. Sprint incurs expenses to sell cellular telephones at a profit, not at cost. Awarding only the expenses would create a discrepancy between what is considered a "loss" for a company that is a victim of theft or fraud, versus a company that is a victim of copyright or trademark violations, where the first cannot recover lost profits but the second can. Neither the text nor the purpose of the MVRA supports this distinction, and making one victim "whole" with lost profits while withholding lost profits from another does not make practical sense. To compensate Sprint fully for its losses, the proper measure of restitution is the full retail value of the merchandise that Ferdman fraudulently obtained.[17] The Court overrules Ferdman's objections regarding use of the retail value in determining the restitution award.

---

[17] Congress expressed concern that restitution be calculated as expeditiously as possible. 18 U.S.C. § 3663A(c)(3) provides that a court shall not order restitution if "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  See also 18 U.S.C. § 3663(a)(1)(B)(ii).  The Court must also be mindful to "impose sentence without unnecessary delay."  Fed. R. Crim. P. 32(b)(1).  The Court does not see a sound reason to require proof for a complicated calculation based on Sprint's costs in providing the cellular telephones for sale when an easier calculation, based on the retail value of the telephones, is rooted in Sprint's losses.  The Court notes that,

C.     THE UNITED STATES' EVIDENCE IS SUFFICIENT TO ESTABLISH SPRINT'S SHIPPING AND INVESTIGATIVE LOSSES.

Ferdman has provided no evidence for his assertion that awarding Sprint restitution in the amount of the telephones' retail value, in addition to investigative costs, shipping costs, and costs to set up GPS tracking for law enforcement, is "double-dip[ping]" because the latter costs are built into the retail price.  Ferdman Objections ¶ 34, at 11.  Sprint asserts that Ferdman's conduct in this conspiracy caused these losses.  See Sprint Letter at 1.  In the absence of contradictory evidence, Sprint's signed representation of its losses satisfies the preponderance of the evidence standard to justify awarding Sprint restitution in the amount of $48,715.59, which includes the merchandise's value, $750.00 in investigative travel costs to New Mexico, $2,600.00 in investigative hours, $300.00 in shipping costs of replacement merchandise to the stores, and $30.00 in costs for setting up GPS tracking for law enforcement.  See Sprint Letter at 1.

Ferdman's argument, that Sprint builds the investigative costs into the retail price of its merchandise, is without merit.  The MVRA specifically authorizes a sentencing court to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."  18 U.S.C. § 3663A(b)(4).  Sprint requests $750.00 for "investigative travel costs," which "were estimated costs for travel to NM to deal

---

while it does not rest its opinion on the ease of calculation, it is easier for a court to take the market value of a shelf product than try to calculate the cost of production, particularly in a case like this one, where no one has given the Court the data to make that computation.  Also, companies that are victims may be reluctant to share such information or go to the expense of making that calculation, causing them to forego a claim of restitution, and be victimized a second time by a legal rule that makes seeking restitution either cost prohibitive or otherwise not worth the effort.

with this issue on a trip." Sprint Letter at 1. Sprint also requested $2,600.00 for "investigative manhours," which was the "investigative time for conducting Sprint's investigation into this issue. The $65/hr rate is an estimate of costs to Sprint for salary and various overhead costs." Sprint Letter at 1. "[S]etting up a GPS tracking in the case for law enforcement" cost Sprint $30.00. These three expenses result directly from Sprint's participation in the investigation and prosecution, and, thus, are properly included in the restitution amount. Further, the investigative costs are standalone costs, and unless the Court orders restitution, it is not clear that Sprint will recover those expenses. They are not built in to retail prices, but are losses.

Sprint also requests $300.00 in shipping costs, the estimated expenses "to be able to ship new phones to the stores to replace phones that were lost to [sic] due to these fraud events." Sprint Letter at 1. It is probably true that Sprint would generally build shipping costs into the retail price of its merchandise, but here, Sprint seeks the shipping costs of replacement merchandise, not of the fraudulently obtained telephones. Sprint may get these costs back down the road, and may make up the $300.00 in the market, but it has not yet done so. Sprint should not have to go to the market to recover its losses. Ferdman caused the expense and he should pay for it now, regardless what Sprint does down the road in a rapidly changing market that may not be as favorable later as it is now for Sprint. The Court, accordingly, overrules Ferdman's objection to this restitution award.

**IT IS ORDERED** that Defendant's Objections to the Presentence Report and Restitution and Sentencing Memorandum, filed August 2, 2013 (Doc. 197) and Defendant's Amended Objections to the Presentence Report, filed August 16, 2013 (Doc. 204), are overruled in part and sustained in part. Ferdman is subject to a 6-level sentence enhancement pursuant to U.S.S.G

2B1.1(b)(1)(D) for a loss more than $30,000.00 but less than $70,000.00.  He is ordered to pay

Sprint restitution in the amount of $48,715.59.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

   *Attorney for the Plaintiff*

John Van Butcher
Federal Public Defender's Office
Albuquerque, New Mexico

   *Attorney for Defendant Joshua Ferdman*

Mark D. Jarmie
Mark D. Standridge
Jarmie & Associates
Albuquerque, New Mexico

-- and --

Tiffany Feder
Encino, California

   *Attorneys for Defendant Amir Meir Levi*

Amy Sirignano
Law Office of Amy Sirignano, PC
Albuquerque, New Mexico

   *Attorney for Defendant Jeffrey P. Contella*

Kirtan K. Khalsa
Khalsa Law Office
Albuquerque, New Mexico

-- and --

Roger J. Rosen
Los Angeles, California

*Attorneys for Defendant Joseph Cohen*